Brian S. Kabateck (SBN 152054)
bsk@kbklawyers.com
Anastasia K. Mazzella (SBN 245201)
am@kbklawyers.com
Annie Martin-McDonough (SBN 344687)
amm@kbklawyers.com
**KABATECK LLP**
633 West Fifth Street, Suite 3200
Los Angeles, California 90071
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

D. Joshua Staub (SBN 170568)
josh@djoshuastaub.com
James C. D. Carr (SBN 308118)
james@carrlawgrp.com
Law Office of D. Joshua Staub
13015 Washington Boulevard
Los Angeles, CA 90066
Telephone: (424) 216-1776

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

LANCE BAIRD, individually, and on behalf of all others similarly situated,

Plaintiffs,

vs.

WELLS FARGO & COMPANY; and WELLS FARGO BANK, N.A., DOES 1-50

Defendants.

Case No. 3:25-cv-05959-JCS

**SECOND AMENDED CLASS ACTION COMPLAINT**

1. **Violation of California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200 et seq.);**
2. **Unjust Enrichment**

Original Complaint Filed: June 6, 2025

Hon. Vince Chhabria
Courtroom: 4

**DEMAND FOR JURY TRIAL**

Plaintiff Lance Baird ("Plaintiff" or "Baird") brings this complaint, by and through his attorneys and on behalf of all others similarly situated, against Defendants Wells Fargo & Company ("WF & Co.") and Wells Fargo Bank, N.A. ("WFBNA") (collectively, the "Defendants" or "Wells Fargo") and allege upon information and belief as follows:

## INTRODUCTION

1. This case arises from Wells Fargo's practice of improperly charging mortgage applicants certain fees during the loan origination process, and its failure to return to borrowers massive amounts of money made as a result of withholding the improperly charged fees for over a decade.

2. Starting around December of 2022, upon information and belief, borrowers throughout California began to receive cryptic letters from Wells Fargo stating that "one or more return to float fees may have been incorrectly assessed during the loan origination process." The letter explains return to float fees ("RTFFs") are "assessed to unlock a loan's interest rate and return it to floating status." It goes on to "apologize for any inconvenience this may have caused" and tries to assuage these borrowers by enclosing a cashier's check for the erroneously assessed "return to float fees and other costs related to closing fees," "interest on the return to float fee and other costs related to closing fees," and an "amount for the time these funds were unavailable."

3. It is unknown exactly when these "incorrect" assessments occurred. Indeed, upon information and belief, Wells Fargo's unscrupulous actions were completely concealed by Wells Fargo until about December of 2022. The letters sent to borrowers neither provide an explanation as to how or why the errors occurred, nor an adequate accounting or itemization to show how the error affected its customers' mortgage loan accounts. It is therefore impossible for borrowers to determine the amount of their actual damages, including their out-of-pocket harm.

4. Upon information and belief, Wells Fargo improperly charged mortgage loan applicants for RTFFs, withheld the money from its borrowers for over a decade, and then, on its own initiative without an initiating request from or other interaction with the borrowers, attempted to settle these damages by sending wholly inadequate cashier's checks to its borrowers without explaining the error.

5. Wells Fargo's flippant attempt to mitigate its liability is inadequate and has left consumers, including Plaintiff, facing ongoing harm and out-of-pocket loss that has yet to be reimbursed.

6. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

## PARTIES

7. Plaintiff Lance Baird is a natural person and a resident and citizen of the State of California.

8. Defendant Wells Fargo Bank, N.A. ("WFBNA") is a national banking association and a citizen of South Dakota, headquartered at 101 North Phillips Avenue, Sioux Falls, Southern Dakota 57104 and with its principal place of business in San Francisco, California. WFBNA may be served with process through its registered agent, Corporation Service Company, 2710 Gateway Oaks Drive, Sacramento, CA 95833.

9. Defendant Wells Fargo & Company ("WF & Co.") is a corporation organized and existing under the laws of the State of Delaware with its headquarters and principal place of business located at 420 Montgomery Street, San Francisco, California 94104. WF & Co. conducts business throughout California and the United States. WF & Co.is registered to do business in California under entity number C2160471.

10. As alleged in greater detail herein, WF & Co.is the parent corporation of Defendant WFBNA. It exercises specific and financial control over the operations of Defendant WFBNA, dictates the policies, procedures, and practices of WFBNA, exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein.

11. Plaintiff is ignorant of the true names and capacities of Defendants DOES 1-50, inclusive, and therefore sue these defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each Defendant so named is responsible in some manner for the injuries and damages sustained Plaintiff, and the putative class, as set forth herein. Plaintiff will

amend this First Amended Complaint to state the names and capacities of DOES 1-50, inclusive, when they have been ascertained.

12. Plaintiff is informed and believes, and thereupon alleges, that at all times mentioned herein, defendants, and each of them, including DOES 1 through 50, inclusive, and each of them, were the agents, servants, employees and/or joint venturers of their co-defendants and were, as such, acting within the course, scope and authority of said agency, employment and/or venture and that each and every defendant, as aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every other defendant as an agent, employee and/or joint venturer.

## JURISDICTION AND VENUE

13. This Court has general subject-matter jurisdiction over this action pursuant to Code of Civil Procedure § 410.10.

14. This Court has personal jurisdiction over Defendants because WF & Co. is a citizen of California and has its principal place of business at 420 Montgomery Street, San Francisco, California 94104. Additionally, during the relevant time period, WFBNA did sufficient business in, had sufficient contacts with, and intentionally availed itself of the laws and markets of California through the promotion, sale, marketing, distribution, and operation of their banking and mortgage products and services as to render exercise of jurisdiction by California courts permissible.

15. Defendants have sufficient minimum contacts with California and have otherwise intentionally availed themselves of the markets in California through the promotion, marketing, and sale of their products and services, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this Court because the acts and/or omissions complained of took place, in whole or in part, within the venue of this Court.

## RELATIONSHIP BETWEEN THE WELLS FARGO DEFENDANTS

17. WFBNA is WF & Co.'s largest, most significant subsidiary. In WF & Co.'s February 2023 Form 10-K states that WFBNA was the "principal subsidiary with assets of $1.7 trillion, or 91% of the Company's assets."

18. At all relevant times, WFBNA acted as the agent, servant, representative, operational arm of WF & Co., and in doing the things alleged herein, WFBNA acted within the course and scope of that agency and with the knowledge, authorization, ratification, and/or consent of WF & Co.

19. At all relevant times, WF & Co. exercised pervasive control, centralized supervision, and unified strategic direction over WFBNA's operations, including but not limited to: oversight of banking and loan-origination policies; control of compliance protocols, risk-management procedures, and customer-facing disclosures; direction of revenue-generating programs, including the float-fee practices at issue in this action; and centralized approval of financial products, customer fee practices, and related business strategies.

20. As part of its corporate governance structure, WF & Co. established consolidated compliance, risk-management, disclosure, and financial-control systems that WFBBA was required to follow. These systems displaced WFBNA's independent discretion and centralized policy-making authority at the parent-company level, making WFBNA the operational arm executing WF & Co.'s directives.

21. Based on forms filed with the United States Securities and Exchange Commission ("SEC"), press releases and other publicly filed documents, WF & Co. dictated, approved, and/or ratified the policies and practices that gave rise to the unlawful conduct, including the use, retention, and/or misuse of customer funds during the loan-origination process.

22. At all relevant times, WF & Co. directed, approved, and/or ratified the policies that allowed WFBNA to retain and use borrower funds during the loan-funding process without proper disclosure, thereby generating hidden float revenue and financial benefit for the "Wells Fargo" enterprise as a whole.

23. WFBNA undertook the challenged conduct—retaining, using, and profiting from borrowers' funds during loan origination—on behalf of and for the benefit of WF & Co., which reported the consolidated revenue, interest earnings, and financial gains derived from these loan origination practices to investors, regulators, and the public.

24. At all relevant times herein, WF & Co. and WFBNA shared common officers,

executives, legal personnel, risk-compliance personnel, and decision-makers, who acted jointly in developing and implementing the policies, procedures, fee structures, disclosures, and account-handling practices at issue in this action.

25. WF & Co. recognizes that it faces liability for its subsidiaries' misconduct. For example, WF & Co. states in several of its SEC 10-Q filings that it potentially faces billions of dollars in losses because of the legal actions filed against it ***and*** its subsidiaries.

26. Through public statements, branding, marketing materials, annual reports, and SEC filings, WF & Co. held WFBNA out as acting on its behalf, representing to the public that "Wells Fargo" operates as a unified, integrated financial institution. For example, WF & Co. does not distinguish between itself and its subsidiaries when disclosing pending legal actions to its shareholders and admits to facing billions of dollars in losses due to cases involving itself and/or its subsidiaries.

27. In WF & Co.'s Form 10-K, filed with the SEC in February 2023 for Q4 2022, WF & Co.'s states: ***"references to 'we,' 'our,' 'us' or 'the Company' mean the holding company and its subsidiaries*** that are consolidated for financial reporting purposes." (Emphasis added.)

28. WF & Co.'s Form 10-Q reports from 2021 - 2025, routinely state: "Wells Fargo and certain of our subsidiaries are involved in a number of judicial, regulatory, governmental, arbitration, and other proceedings or investigations concerning matters arising from the conduct of our business activities, and many of those proceedings and investigations expose Wells Fargo to potential financial loss or other adverse consequences." The filings go on to identify the pending proceedings without distinguishing between WF & Co. and its subsidiaries.

29. WF & Co. has sole authority to resolve and remediate wrongful practices committed by its subsidiaries, including WFBNA. On April 20, 2018, WF & Co. entered into consent orders with the Office of the Comptroller of the Currency (OCC) and Consumer Financial Protection Bureau (CFPB) to address issues regarding "certain interest rate-lock extensions on home mortgages and collateral protection insurance placed on certain auto loans."

30. WFBNA did not operate independently with respect to the RTFFs at issue in this case or with respect to home mortgages in general. WF & Co. maintained and enforced uniform

corporate policies and enterprise-wide governance structures that WFBNA was required to follow.

31. In 2018, the CEO of WF & Co. at the time, Tim Sloan, stated that WF & Co. was working with regulators to strengthen "operational processes, internal controls, compliance, and oversight." (*In re Wells Fargo Bank, N.A.*, Consent Order, File No. 2018-BCFP-0001 (Bureau of Consumer Financial Protection (CFPB") Apr. 20, 2018, *Wells Fargo Enters into Consent Orders with OCC and CFPB*, Press Release, Wells Fargo & Co. (Apr. 20, 2018.)

32. On December 20, 2022, the CFPB ordered WFBNA to pay $3.7 billion in connection with mortgage servicing violations. (*In re Wells Fargo Bank, N.A.*, Consent Order, File No. 2022-CFPB-0007 (CFPB Dec. 20, 2022).) That same day, WF & Co. issued a press release—making no distinction between itself and WFBNA. – in which its CEO at the time, Charlie Scharf, stated that Wells Fargo was working to "transform the operating practices at Wells Fargo . . .and run the company in a more controlled, disciplined way." (*Wells Fargo Enters into Agreement with CFPB to Resolve Multiple Issues*, Press Release, Wells Fargo & Co. (Dec. 20, 2022).)

33. WF & Co.'s December 2022 press release also lists several ways the "company" has changed the way it operated, including making significant changes to senior leadership, embedding greater accountability for risk management, identifying and mitigating operational risks, etc. WF & Co.'s press releases clearly indicate that it has the power to, and in fact does, exercise control over WFBNA's operational practices, policies, and procedures.

34. Plaintiffs and class members reasonably believed they were dealing with a single Wells Fargo enterprise, centrally controlled and directed by WF & Co., and that WFBNA was acting as WF & Co.'s representative in offering, processing, and administering the loans and associated fees at issue.

35. As evidenced by SEC filings, WF & Co. was a direct and intended beneficiary of the fee-generation, interest earnings, and float-handling practices carried out by WFBNA, and received the financial benefits of such conduct through consolidated revenues, profits, and shareholder returns.

36. WF & Co. had full knowledge of the conduct and ratified it by accepting the financial benefits, failing to discipline responsible personnel, and continuing the challenged practices despite repeated customer complaints, regulatory scrutiny, and internal notice.

37. Even if WFBNA initially acted without express authorization, WF & Co. had a duty to exercise reasonable oversight and supervision over the operations of its largest, most valuable subsidiary, WFBNA, particularly with respect to customer-facing financial practices, compliance obligations, fee disclosures, account handling, and adherence to federal and state consumer-protection laws.

38. At all relevant times, WF & Co. and WFBNA operated as joint venturers in the float-fee scheme. They shared a common business purpose—maximizing enterprise-wide revenue through the temporary retention and use of borrower funds. They jointly controlled the means and methods of the scheme through shared executives, unified compliance and risk-management structures, and integrated operational systems. And, they shared the resulting profits and risks, as float-related revenue was pooled and recognized on a consolidated basis at the parent-company level, while regulatory and litigation exposure was managed collectively across the "Wells Fargo" enterprise.

39. In addition, WF & Co. is the alter ego of WFBNA because WF & Co. exercised such pervasive control and domination over WFBNA's operations—including control of policies, financial reporting, compliance, and governance relating to the challenged conduct—that the subsidiary had no separate will or corporate existence with respect to the float-fee practices. Adhering to the fiction of separate corporate existence would sanction a fraud or promote injustice by allowing WF & Co. to benefit from and conceal the unlawful conduct carried out by its controlled subsidiary.

**THE IMPROPERLY CHARGED "RETURN TO FLOAT FEES"**

40. Mortgage rates vary over time due to market conditions. At the time of application, and because weeks and sometimes months separate applications from closing, mortgage-lending applicants can and often do sign rate lock agreements to protect against rising interest rates while their loan is being processed. In a typical rate lock agreement, the lender guarantees the agreed

upon rate for a specific period even if the market rates increase.

41. If interest rates go down prior to closing and applicants want to take advantage of the lower rate, applicants who entered into rate lock agreements can request to exit the locked rate and let the rate return to float where it can fluctuate based on market conditions. Some lenders charge RTFFs to compensate for the risk and potential loss from the original locked rate.

42. Whether borrowers must pay RTFFs to exit their locked rates is a matter of lender policy. Like most other national banks with mortgage-lending practices, upon information and belief, WFBNA had, during the relevant time period, a policy to charge borrowers RTFFs to unlock their rates. It is worth noting that WFBNA's website currently states: "There is no fee to return your loan to float."[1]

43. Beginning in or around December 2022, consumers began to receive vague letters from Wells Fargo Home Mortgage, a division of WFBNA, informing them that "one or more return to float fees may have been incorrectly assessed during the loan origination process." The letter stated: "We apologize for any inconvenience this may have caused" and enclosed a cashier's check purportedly for the "return to float fees and other costs related to closing fees," "interest on the return to float fee and other costs related to closing fees," and an "amount for the time these funds were unavailable." Upon receiving these form letters from WFNBA, Plaintiff and other similarly situated consumers were left with more questions than answers.

44. Upon information and belief, WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, incorrectly charged Plaintiff and other similarly situated borrowers RTFFs in connection with their mortgage loan applications. WFBNA and WF & Co. then attempted to settle these damages by sending cashier's checks in hopes that their borrowers would not investigate the nature and extent of the error or pursue a remedy for same.

45. Because WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, failed to provide any explanation of the error, it is unknown when it committed theses "incorrect"

[1] See "What is an interest rate lock for mortgages?" https://www.wellsfargo.com/mortgage/learn/rate-lock/#:~:text=There%20is%20no%20fee%20to%20return%20your%20loan%20to%20float,to%20float%20is%20not%20available

assessments. It is clear, however, that WFBNA and WF & Co.'s unscrupulous actions were completely concealed until about December of 2022 when WFBNA began disclosing the wrongly assessed fees to consumers.

46. Because WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, failed to provide adequate accounting to show the nature and extent of the error (or how it calculated the amount of compensation to the borrower), it is impossible for a consumer to determine or demand the amount of their actual damages, including their out-of-pocket harm.

47. Upon information and belief, WFBNA's practice of improperly charging for RTFFs during the loan origination process and its subsequent attempts to "buy off" their customers, resulted in an overall financial gain for WFBNA, and its parent company WF & Co.

48. Upon information and belief, notwithstanding the purported refunds distributed by WFBNA beginning in or around December of 2022, WFBNA and WF & Co. have never paid or disgorged to its victims the full profits WFBNA and/or WF & Co. earned on the incorrectly charged RTFFs. Additionally, WFBNA and WF & Co., used an arbitrary interest rate to reimburse customers – a rate that was far less than the 7% rate mandated under the California Constitution, Article XV, section 1. By failing to pay Mr. Baird and similarly situated plaintiffs California's constitutional legal interest rate, Defendants were able to keep the delta for themselves and, on information and belief, earn interest and/or profits on the detained funds.

49. Upon information and belief, despite having access to more specific information concerning the borrower's account and the error committed (and the extent of each consumer's harm), WFBNA intentionally disseminated vague letters to discourage consumers from looking into the issue further and exercising their rights.

50. Upon information and belief, the purpose of these letters was not to make the consuming public whole but rather these letters are a throw away effort by WFBNA and WF & Co. to shield itself from liability for yet another illegal business practice by offering an inadequate benefit.

51. Upon information and belief, WFBNA and WF & Co. knew that Plaintiff and other similarly situated consumers would have no way of knowing if the amount offered was sufficient

to cover the harms caused by WFBNA and WF & Co.'s acts and/or omissions. Rather, WFBNA and WF & Co. placed the burden on the consumer to figure out whether the amount offered was sufficient to cover the damage they sustained by this unlawful detention of money, when WFBNA and WF & Co. know they did not.

52. Plaintiff and those similarly situated were not aware of the violations alleged herein, nor the facts giving rise to such violations, until they received the letters from WFBNA in December of 2022. Before that time, Plaintiff and those similarly situated had no reason to suspect that WFBNA had committed errors or otherwise overcharged their accounts.

53. Upon information and belief, Plaintiff and those similarly situated did not discover and could not have discovered through the exercise of reasonable diligence, the fact that Defendants had committed errors during the loan origination process.

54. Plaintiff and those similarly situated are further informed and believe that Defendants intentionally concealed the complained of business practices herein for at least fifteen years, preventing the discovery of these violations prior to December of 2022.

55. Fraudulent concealment tolls the statute of limitations because Plaintiff and those similarly situated were unaware that their rights were being violated by WFBNA and/or WF & Co.'s bad acts. Indeed, Defendants' violations were carried out in a way that precluded detection of the violations.

56. As a result, the claims of Plaintiff and those similarly situated did not accrue until their discovery in 2022 and are tolled under equitable tolling principles such that they are timely.

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

57. In 2010, Mr. Baird applied for a home mortgage loan with WFBNA.

58. Mr. Baird did not sign a Rate Lock Agreement during his mortgage loan origination process.

59. On October 21, 2010, Mr. Baird signed an "Adjustable Rate Note," obligating him to make monthly mortgage payments, principal and interest, to Wells Fargo Home Mortgage. Under the terms of the Adjustable Rate Note, interest would be charged on unpaid principal at a rate of 2.750% per year until the full amount of principal had been paid. Further, the interest rate

would be subject to change on January 1, 2016 and "on that day every 12th month thereafter." Interest rates would change based on an "Index," meaning the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board.

60. Under the relevant laws at that time, RTFFs should have been disclosed in the Promissory Note (or, here, in the Adjustable Rate Note) or the Real Estate Settlement Procedures Act (RESPA) HUD-1 settlement statement. Mr. Baird's Adjustable Rate Note and HUD-1 Statement do not mention "float fees," or a return to float fees.

61. On December 29, 2022, WFBNA sent Mr. Baird a letter and cashier's check in the sum of $3,270.75. The letter purports to include "$2,510.65 for the return to float fees and other costs related to closing fees," "$387.39 interest on the return to float fee and other costs related to closing fees," and an additional $372.71 to compensate "for the time these funds were unavailable."

62. The letter does not provide any information on how WFBNA and/or WF & Co. determined the amount of interest to apply to the money they used or detained. Likewise, there is no explanation on how they determined the amount to give Mr. Baird for loss of use of his funds.

63. Based on the amounts WFBNA and WF & Co. paid to Mr. Baird for the improperly charged RTFF and interest combined with the fact that they detained his money for approximately 12 years, the interest rate Defendants paid to Mr. Baird is considerably less than California's constitutional legal rate of 7% simple interest per year (Cal. Const., art. XV, §1).

**CLASS ALLEGATIONS**

64. Plaintiff brings this class action lawsuit on behalf of himself and on behalf of the following proposed class pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3):

> All persons within California, who received a letter from Wells Fargo alerting them that one or more return to float fees may have been incorrectly assessed during the loan origination process with a check enclosed to purportedly compensate for the error (the "Class" or "Class Members").

65. Excluded from the class are the following individuals: officers and directors of

Defendants and their parents, subsidiaries, affiliates, and any entity in which Defendants have a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

66. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

67. All requirements under the Federal Rules of Civil Procedure are satisfied:

a. **Ascertainability**. The Class is readily ascertainable through Defendants' business records, transactional data, customer account records, and other objective criteria within Defendants' possession, custody, or control.

b. **Numerosity – Rule 23(a)(1).** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of class members is unknown to Plaintiff at this time, upon information and belief, Plaintiff believes the class numbers to be in the thousands, if not more.

c. **Commonality – Rule 23(a)(2)**. Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual members of the Class, including the following:

i. Whether Plaintiff and the Class Members received a letter or letters from Wells Fargo indicating that RTFFs may have been incorrectly assessed during the loan origination process;

ii. Whether Plaintiff and the Class Members received a check from Wells Fargo to compensate them for RTFFs incorrectly assessed during the origination process;

iii. Whether Wells Fargo failed to disclose the nature and extent of the error relating to the fees incorrectly assessed during the loan origination process of Plaintiff and the Class Members;

iv. Whether the conduct of Defendants was "unfair" or "unlawful" as those terms are defined in the UCL;

v. Whether Defendants unlawfully took and retained monies belonging to

Plaintiff and the Class;

vi. Whether Defendants should have, but did not, refund all profits obtained by Defendants on monies unlawfully taken and retained;

vii. Whether Defendants were unjustly enriched by the complained of conduct herein;

viii. Whether, as a result of Defendants' conduct, Plaintiff and the Class suffered injury; and

ix. The nature of the relief, including equitable relief, to which Plaintiff and the Class Members are entitled.

d. **Typicality – Rule 23(a)(3)**. Plaintiff's claims are typical of the claims of the Class Members because, among other things, Plaintiff sustained similar injuries to that of the Class Members as a result of Defendants' uniform wrongful conduct, and their legal claims all arise from the same events and wrongful conduct by Defendants.

e. **Adequacy – Rule 23(a)(4)**. Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff's interests do not conflict with the interests of the Class Members and Plaintiff has retained counsel experienced in complex class action cases to prosecute this case on behalf of the Class.

f. **Predominance – Rule 23(b)(3)**. Common issues predominate over any individual issues because Defendants' misconduct was uniformly applied to all Class members. Liability can be established with common proof, including Defendants' standardized policies, procedures, disclosures, transactional data, and internal records. Damages are capable of measurement on a class wide basis using common methodologies.

g. **Superiority – Rule 23(b)(3)**. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since a joinder of all members is impracticable. Furthermore, as damages suffered by Class Members may be relatively small, the expense and burden of individual litigation make it impossible for class members to individually redress the wrongs done to them. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay

and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

h. **Rule 23(b)(2) Injunctive/Declaratory Relief Class.** Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive and/or declaratory relief appropriate with respect to the Class as a whole. Defendants' continuing policies and practices, including failing to pay interest based on California's legal interest rate of 7%, create a real and immediate threat of ongoing harm to Plaintiff and the Class.

i. **Manageability.** There are no significant management difficulties that would impede certification. The claims arise from standardized practices provable through Defendant's own records. Class-wide damages, restitution, and equitable relief can be calculated through commonly accepted methodologies.

68. Accordingly, this class action is properly brought and should be maintained as a class action because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of California's Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

### (On Behalf of Plaintiff and the Class Against all Defendants)

69. Plaintiff re-alleges and incorporates by reference each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

70. The UCL defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

71. The UCL imposes strict liability. Plaintiff need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

72. The UCL imposes liability on any person who participates in, directs, or materially assists an unlawful business practice. Parent corporations, like WF & Co., are subject to UCL liability where they contribute to, direct, or benefit financially from the challenged conduct.

73. As alleged in the preceding paragraphs, WFBNA acted as the agent and operational arm of WF & Co. in executing the uniform loan-origination and funds-handling practices that generated the unlawful float-fee profits at issue. Plaintiff further allege that WF & Co. and WFBNA operated as a joint enterprise, jointly controlling and profiting from the challenged practices, and that WF & Co.'s pervasive and substantial control over WFBNA renders the entities alter egos with respect to the misconduct alleged. Accordingly, WF & Co. is liable under the UCL for the unlawful, unfair, and fraudulent business practices carried out through its integrated enterprise with WFBNA.

***<u>Deceptive/Fraudulent Prong</u>***

74. An omission is "deceptive" and actionable under the UCL if it is an omission of a fact that the defendant was obliged to disclose.

75. WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, represented to borrowers, expressly and by omission, that all fees assessed at loan origination were lawful, authorized, and properly disclosed. In reality, WFBNA, and by extension WF & Co., had improperly charged RTFFs and other closing-related float charges that were never permitted under the governing loan documents or applicable law.

76. Defendants concealed the existence of these improper charges for more than a decade, despite knowing (a) that the fees had been unlawfully collected, (b) that borrowers had no means of detecting the unlawful charges on their own, and (c) that WF & Co. and WFBNA, through their agency relationship, joint venture, and/or as alter egos, had earned interest or profits on these funds during the period of concealment.

77. Defendants further knew that borrowers, who reasonably believed "Wells Fargo" was a single entity that acted as the lender, expected the bank to disclose and correct any unlawful fee practices in a timely and accurate manner and that withholding such information would mislead consumers into believing their loans had been correctly calculated and all charges were proper.

78. When WFBNA eventually acknowledged the improper float fees, it sent a form letter and a small "refund" check to borrowers (including Plaintiff) that affirmatively implied that the enclosed check fully compensated the borrower for all improperly collected RTFFs and related charges.

79. WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, drafted and disseminated this letter despite knowing the enclosed amount was inadequate because it did not reflect the full amount of unlawful fees collected because it did not include sufficient compensation for the time-value of the unlawfully held funds, and it did not include the statutory legal rate of interest owed to Plaintiff and the Class under the California Constitution.

80. WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, also knew and intended that borrowers would be unable to verify the accuracy of the refund—because the underlying transactions had occurred a decade or more prior to the "refunds," the records were opaque to consumers, and WFBNA, at WF & Co's direction, supervision or ratification, did not disclose the data or methodology used to calculate the check amount.

81. WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, sent this communication with the intent and effect of leading borrowers to believe that (a) the issue had been fully resolved, (b) acceptance of the check constituted complete compensation, and (c) no further rights or claims existed—thereby inducing borrowers to forego asserting their full refund rights.

82. These practices were likely to deceive reasonable consumers, who would naturally assume (a) that a national bank accurately discloses all fees, (b) that any self-initiated remediation by the bank accurately reflects all amounts owed, and (c) that a refund check mailed more than a decade after the fact reflects complete restitution.

83. Defendants' conduct satisfies the "fraudulent" prong even without proof of reliance or damages, because the probability of consumer deception is inherent in Defendants'

concealment, half-truths, and misleading partial disclosures concerning the amount and adequacy of the refund.

***Unfair Prong***

84. The UCL prohibits "unfair competition," which is broadly defined as including "any unlawful, unfair or fraudulent business acts or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200.

85. Defendants' business practices, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

86. WFBNA, by or under the direction or supervision of WF & Co. or through WF & Co.'s ratification, imposed unauthorized RTFFs, concealed those charges for more than a decade, and in doing so, profited from the improperly collected funds. Borrowers had no practical ability to detect or prevent these charges because Defendants alone controlled the fee disclosures, loan records, and internal accounting.

87. When WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, finally contacted borrowers, it issued materially inadequate remediation checks while implying that the enclosed payment constituted a full refund. WFBNA and WF & Co. knew borrowers could not verify the amount or access the underlying records necessary to determine what they were actually owed.

88. These practices violated legislatively declared public policies requiring accurate fee disclosures, good-faith dealing in financial transactions, and the prompt return of money wrongfully collected from consumers.

89. The harm to Plaintiff and the Class grossly outweighs the utility of Defendants' practices as there is no utility to practices of Defendants.

90. Defendants had other reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. The failure to do so is oppressive and harsh.

***Unlawful Prong***

91. Under the UCL, a business act or practice is "unlawful" if it violated any established state or federal law.

92. By improperly charging RTFF fees that Plaintiff never owed or agreed to pay and then using those ill-gotten gains for their own profit or benefit, Defendants WFBNA and WF & Co. were unjustly enriched by their misconduct, which is an "unlawful" practice under California common law.

93. Similarly, Defendants were unjustly enriched by paying Plaintiff interest on the detained funds in an amount less than 7% per year, as required under the California Constitution, Article XV, §1.

94. Additionally, WFBNA, acting as WF & Co.'s agent, joint venturer, and/or alter ego, essentially forced Plaintiff and the Class Members to "pay" Wells Fargo RTFFs without Plaintiff's or the Class Members' authorization or knowledge. WFBNA then funneled profits and/or interest earned on the detained funds to WF & Co. These actions constitute conversion under California common law.

95. Defendants' practice of taking Plaintiff and the Class Members' money is unconscionable, oppressive, and surprising to Plaintiff and the Class Members.

96. Plaintiff and the Class Members suffered actual monetary financial injury in that money was taken and withheld from Plaintiff and the Class Members by Defendants. Plaintiff and the Class Members had an ownership interest in this money, and thus are entitled to full restitution.

97. Pursuant to the UCL, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief and order that Defendants cease this unfair and unlawful competition, as well as disgorgement to Plaintiff and the Class of all the revenues associated with this unfair and unlawful competition, or such portion of said revenues as the Court may find applicable.

98. Plaintiffs also seek a full and complete accounting of RTFF funds that Defendants wrongfully withheld or retained during the loan-origination and funding process, including the

precise amounts collected, the people from whom Defendants withheld the funds, the precise duration for which those funds were held, and all float fees, interest, earnings, liquidity benefits, or other financial gains derived therefrom. Plaintiffs also seek an accounting of the methodology that WFBNA and/or WF & Co. used—or should have used—to determine the amounts owed to customers for interest and the loss of use and time-value of their money, including any formulas, internal calculations, system-wide practices, or revenue-allocation models employed in connection with these funds. Such information is uniquely within Defendants' possession, and an accounting is necessary to ascertain the full extent of monies wrongfully obtained and the restitution or other equitable relief to which Plaintiff and the Class are entitled.

99. Plaintiff and the Class reserve the right to allege further conduct that constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date.

**<u>SECOND CAUSE OF ACTION</u>**

**Unjust Enrichment**

**(On Behalf of Plaintiff and the Class Against all Defendants)**

100. Plaintiff re-alleges and incorporates by reference each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

101. Plaintiff and the Class have conferred a benefit on Defendants by, at a minimum, having Defendants retain funds that Defendants improperly charged Plaintiff and the Class without their consent or knowledge.

102. Defendants' practice of charging Plaintiff and Class Members without their consent also resulted in Plaintiff and Class Members being denied the benefit of having access to these funds.

103. Defendants appreciate and/or have knowledge of the benefits conferred upon it by Plaintiff and the Class.

104. Under principles of equity and good conscience, Defendants should not be permitted to retain the monies they unjustly received because of its wrongful conduct described herein.

105. Accordingly, Plaintiff, on behalf of himself and the Class Members, seek restitution

and disgorgement of all amounts by which Defendants have been unjustly enriched, as well as a constructive trust on money or property unlawfully converted by Defendants;

106. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendants received.

107. Plaintiff and Class members have no adequate remedy at law.

108. Accordingly, Plaintiff, on behalf of himself and the Class Members seek a full accounting, as set forth in Paragraph 98 above. Further, a constructive trust should be imposed on all unlawful or inequitable sums received by Defendants traceable to Plaintiff and Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter a judgment in their favor and against Defendants, as follows:

1. Determining that this action may be maintained as a class action under the Federal Laws of Civil Procedure and appointing Plaintiff and his counsel to represent the Class;

2. Requiring Defendants bear the cost of Class notice;

3. Finding Defendants' conduct was unlawful as alleged herein;

4. Requiring full restitution the amounts wrongfully retained as a result of Defendants' wrongful conduct, including payment of the difference between the interest that was paid and the difference that should have been paid under the California Constitution, Article XV, § 1, and the full time-value or loss of use that Plaintiff and the Class suffered as a result of the wrongfully detained funds.

5. Imposing a constructive trust on money or property unlawfully converted;

6. Awarding Plaintiff and Class Members actual damages, compensatory damages, punitive damages, statutory damages, and statutory penalties, in an amount to be determined;

7. Awarding Plaintiff and Class Members costs of suit and attorney's fees, as allowable by law;

8. Awarding Plaintiff and Class members pre- and post-judgment interest, to the extent allowable; and

9. Granting such other and further relief as this Court may deem just and proper.

Dated: February 26, 2026

**KABATECK LLP**

By: ______________________________

Brian S. Kabateck
Shant A. Karnikian
Anastasia K. Mazzella
Annie Martin-McDonough

*Attorneys for Plaintiff and the Putative Class*

**JURY DEMAND**

Plaintiff demands a trial by jury for all claims so triable.

Dated: February 26, 2026

**KABATECK LLP**

By: ______________________

Brian S. Kabateck
Shant A. Karnikian
Anastasia K. Mazzella
Annie Martin-McDonough

*Attorneys for Plaintiff and the Putative Class*